UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x

JOE HAND PROMOTIONS, INC., as            :
Broadcast Licensee of the
June 11, 2005 Tyson/McBride Program :

                          Plaintiff, :   **REPORT AND RECOMMENDATION**

                                     :   07 Civ. 6907 (GBD)(MHD)
            -against-                :

RICARDO MARTINEZ, Individually and   :
d/b/a LUCKY 7,
                                     :
                          Defendants.
-------------------------------------x

TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:

Plaintiff Joe Hand Promotions, Inc. (hereinafter, "Joe Hand") commenced this action on July 31, 2007, seeking damages from Lucky 7 restaurant and its proprietor Ricardo Martinez for the alleged theft of cable television services in violation of sections 553 and 605 of the Communications Act of 1934 (amended by the Cable Communications Policy Act of 1984). 47 U.S.C. §§ 553, 605. Plaintiff alleges that on June 11, 2005 defendants unlawfully intercepted and received the "Tyson/McBride program," a pay-per-view boxing event, and displayed it to restaurant patrons. (Compl. ¶¶ 15-19). Defendants failed to answer the complaint, and accordingly a default judgment was entered against them.

1

Plaintiff seeks statutory damages, attorney's fees and costs. We recommend that the court enter judgment awarding the plaintiff $15,000.00 in statutory damages, $856.26 in attorney's fees and $450.00 in costs against the two defendants jointly and severally.

## A. Procedural Background

Plaintiff filed its complaint on July 31, 2007. Although defendants were served with the summons and copies of the complaint, they failed to answer or otherwise respond. Accordingly, on October 24, 2007, the District Court entered a default against them and referred the matter to this court to conduct an inquest on damages. Following a pre-inquest conference with plaintiff's counsel on November 19, 2007, we authorized plaintiff to proceed by serving and filing motion papers by November 30, 2007, and offered defendants the opportunity to serve and file a response by December 14, 2007. (Order dated November 20, 2007).

## B. The Evidentiary Record

A party's default "is deemed to constitute a concession to all well-pleaded allegations of liability," but it is not

considered "an admission of damages." E.g., Greyhound Exhibitgroup v. E.L.U. Realty Group, 973 F.2d 155,158 (2d Cir. 1992); Cotton v. Slone, 4 F.2d 176, 181 (2d Cir. 1993) (citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)). To determine the amount of damages, we rely on the factual allegations of the complaint as well as the additional affidavits filed by the plaintiff containing pertinent factual information. See, e.g., Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d Cir. 1991) (quoting Fustok v. ContiCommodity Servs. Inc., 873 F.2d 38, 40 (2d Cir. 1989)).

Joe Hand Promotions, Inc. is a family business which, according to its president, has paid millions of dollars for the rights to sub-license pay-per-view broadcasts of boxing events. (See Aff. of Joe Hand, Jr. sworn to Sept. 18, 2007 at ¶ 12). Over time, however, it has experienced an erosion of sales to commercial establishments as a result of signal piracy of its broadcasts. (See id. at ¶¶ 4 & 12) As an example, a prior commercial customer explained to Mr. Hand that he will no longer purchase pay-per-view events from the plaintiff, preferring to risk the small penalty imposed in the unlikely event that he were to be caught engaging in signal piracy. (See id. at ¶ 13)

Joe Hand purchased an exclusive license to distribute the June 11, 2005 television broadcast of the Tyson/McBride boxing event ("the Program") in certain geographical territories, including the State of New York. (Compl. ¶ 15). The Program included a boxing match between Mike Tyson and Kevin McBride, all undercard bouts and the entire accompanying television broadcast. (Id.). Pursuant to the licensing contract, Hand marketed the right to publicly exhibit the Program to commercial establishments such as theaters, arenas, bars, clubs, lounges, and restaurants. (See Compl. ¶¶ 16 & 17). The transmission of the Program by closed circuit television and encrypted satellite signal was made available only to paying establishments. (See Compl. ¶ 15). The rate card for the Program indicates that the plaintiff charged commercial establishments, other than casinos, $10.00 multiplied by the fire code capacity of the establishment, plus a $200 authorization fee. (See Hand Aff. at Ex. B). Absent a sublicense agreement with plaintiff, commercial establishments (including Lucky 7) were not authorized to receive and exhibit the transmission. (See Compl. ¶ 18-20).

Joe Hand hired investigators to visit numerous locations in New York City on the night of June 11, 2005 in order to determine whether the Program was being illegally intercepted and exhibited. On June 11, 2005, investigator Edgardo Rodriguez

observed an unauthorized exhibition of the Program to patrons of Lucky 7 restaurant. (See Hand Aff. at Ex. D (Piracy Aff. of Edgardo Rodriguez, sworn to on June 20, 2005)). He reports that the Program was exhibited on one 32-inch television monitor in the Lucky 7 establishment and that he counted 25 people on the premises at the time. (See id.). Rodriguez estimates that the restaurant had a capacity of approximately 100, and reports that it had a bar serving alcoholic drinks. (Id.).

A commercial establishment that is intent on accessing a pay-per-view broadcast without a license has several options. These include 1) purchasing a "blackbox," which, when installed on a cable TV line, will descramble a pay-per-view broadcast signal, 2) misrepresenting itself to be a residence in order to purchase a pay-per-view broadcast at the residential rate of no more than $50.00, which is considerably less expensive than a commercial license, 3) illegally tapping into a cable from an adjacent residence that purchased the broadcast at the residential rate, and diverting the program to the commercial establishment, and 4) applying similar methods as in 1, 2 and 3 to DSS or C-Band Satellite Systems. (See id. at ¶ 14) These methods permit repeated interception of multiple pay-per-view events.

Apart from documenting defendants' piracy of the Program at issue in this lawsuit, plaintiff proffers evidence suggesting that Lucky 7 and its owner unlawfully intercepted and broadcast pay-per-view events to patrons on at least two additional occasions. (See Aff. of Julie Cohen Lonstein, Esq., sworn to Oct. 15, 2007 at ¶¶ 5 & 6, & Exs. B & C). Plaintiff does not state, however, that it brought these prior violations to the attention of the defendants.

## ANALYSIS

### I. Damages Under the Communications Act

The Second Circuit has held that 47 U.S.C. §§ 605(a) and 553(a)(1) both apply to the unauthorized interception of signals from a cable television system. Section 605(a) prohibits a broad range of unauthorized interception of communications, while section 553 concerns only interception of cable transmissions. See Int'l Cablevision Inc. v. Sykes, 75 F.3d 123, 133 (2d Cir. 1996). Each of these provisions authorizes the court to grant an award to an aggrieved party of either actual damages plus the profits accruing to the defendant by virtue of his violation or, alternatively, an award of statutory damages. 47 U.S.C. §§ 553 (c)(3)(A), 605(e)(3)(C)(I).

## A. General Criteria for Statutory Damages

Although a defendant may be liable under both section 553 and section 605, the plaintiff may recover only once. See, e.g., KingVision Pay-Per-View, Ltd. v. New Paradise Rest., 2000 WL 378053, at *2 (S.D.N.Y. Apr. 11, 2000); Time Warner Cable of N.Y. City v. Barnes, 13 F. Supp. 2d 543, 548 (S.D.N.Y. 1998); Time Warner Cable of N.Y. City v. Taco Rapido Rest., 988 F. Supp. 107, 110 (E.D.N.Y. 1997); but see King Vision Pay-Per-View v. Las Cazuelas Mexican Restaurant, 99 Civ. 10041, 2000 WL 264004 at *3 (S.D.N.Y. March 9, 2000). Joe Hand, predictably, seeks statutory damages under section 605, which is more generous to prevailing plaintiffs than section 553.[1]

Under the terms of section 605(e)(3), statutory damages may range from $1,000.00 to $10,000.00 for "each violation" of section 605(a). 47 U.S.C. § 605(e)(3)(C)(i). The ceiling goes up to $100,000.00 per violation if the violation was "committed

---

[1]Section 553 gives the court discretion to award between $250.00 and $10,000.00 in statutory damages for "all violations," 47 U.S.C. § 533(C)(3)(A)(ii), but with the proviso that the maximum award may be increased by up to $50,000.00 for violations "committed willfully for the purpose of commercial advantage or private financial gain . . . ." 47 U.S.C. § 553(c)(3)(B). Section 553 also authorizes the court to reduce the award of statutory damages to a minimum of $100.00 if it "finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section." 47 U.S.C. § 553(c)(3)(C).

willfully and for the purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. § 605(e)(3)(C)(ii). Section 605 also gives the courts discretion to reduce the statutory award against an innocent violator, with a prescribed $250.00 minimum for unintended violations. See 47 U.S.C. § 605(e)(3)(C)(iii).

## B. The Calculation of Damages

The measurement of statutory damages is within the sound discretion of the District Court. See, e.g., Taco Rapido Rest., 988 F. Supp. at 111 (citing 47 U.S.C. § 605(e)(3)(C)(i)(II)). When assessing damages under section 605, courts generally choose between two methods of calculation -- a per-customer damage calculation or a flat-sum award. See Kingvision Pay-Per-View v. Recio, 2003 WL 21383826 at *4 (S.D.N.Y. June 11, 2003).

The per-customer approach employs a formula that multiplies a dollar amount per customer by the number of patrons present during the unauthorized exhibition. See, e.g., Taco Rapido Rest., 988 F. Supp. at 111 (awarding $50.00 per patron); New Contenders, Inc. v. Diaz Seafood Corp., 1997 WL 538827, at *2 (S.D.N.Y. Sept. 2, 1997) (awarding $300.00 per patron); Cablevision Sys. Corp. v. 45 Midland Enters., 858 F. Supp. 42, 45 (S.D.N.Y. 1994) (awarding

8

$50.00 per patron). The flat-sum approach is typically used when the number of patrons who observed the unauthorized programming is unknown. See, e.g., Entm't by J & J, Inc. v. Ramsarran, 2002 WL 720480 at *2 (E.D.N.Y. Mar. 11, 2002). In such a situation, courts have, in typically vague terms, imposed a damage amount that the "court considers just." Recio, 2003 WL 21383826, at *3 (citing § 605(e)(3)(C)(i)(II)); see also Garden City Boxing Club, Inc. v. Polanco, 2006 WL 305458, at *5 (S.D.N.Y. February 7, 2006).

Factors considered by courts in determining a damages award include the financial loss to the plaintiff, the costs the defendant avoided, the profits realized by the defendant as a result of the event, the financial burden of an award on the defendant, and the adequacy of the deterrent effect. See id. (considering the cost avoided, disgorgement of profits and deterrence, without putting the defendant out of business); Ramsarran, 2002 WL 720480, at *2 (considering financial loss to plaintiff and financial status of defendant); Entm't by J & J, Inc. v. Al-Waha Enters., 219 F. Supp. 2d 769, 776 (S.D. Tex. 2002) (increasing award from $1500.00, the cost defendant avoided, to $5000.00 in light of deterrence goal of 47 U.S.C. § 605).

In this case, plaintiff's lost profits can be determined from the rate card used for commercial establishments. (Hand Aff. at Ex. B). The rate card indicates that plaintiff charged commercial establishments, other than casinos, $10.00 multiplied by the fire code capacity, plus a $200.00 authorization fee. (Id.) Although the fire code capacity of Lucky 7 is not in the record, Mr. Rodriguez estimated that it has a capacity of 100 persons. (Id. at Ex. D). By comparison, on two other occasions, investigators who observed pirated television programs at Lucky 7 estimated it to have a capacity of 75 persons and 60 persons. (See Lonstein Aff. ¶¶ 5-6, Exs. B & C).

Lost revenue to the plaintiff can thus be estimated to be between $800.00 (for a capacity of 60) and $1,200.00 (for a capacity of 100) for this single event. Assessing damages solely in the amount that defendants would have had to pay for a license, however, would ignore the profits they presumably earned by the illegal exhibition of the boxing match, and such an outcome would have no deterrent effect. See Al-Waha Enters., 219 F. Supp. 2d at 776. Although Lucky 7 apparently did not charge patrons an entry fee,[2] the evident purpose of exhibiting the Program was to attract customers in order "to realize increased profits from the sale of food and beverages, which profits should

---

[2] The Edgardo Rodriguez Piracy Affidavit makes no mention of a cover charge. (Hand Aff. at Ex. D).

10

be disgorged." Polanco, 2006 WL 305458, at *5.

    The amount of profit from the sale of food and beverages obviously depends on the number of patrons. The record before us indicates that the plaintiff's investigator counted 25 people in the Lucky 7 at the time he observed the Program being exhibited. (Hand Aff. at Ex. D).

    Although Mr. Rodriguez does not specify whether this count includes restaurant employees, we infer, in the absence of opposition by defendants, that he refers to the number of patrons. That said, we do not have information regarding the revenues earned by the Lucky 7 for the evening in question, much less its profits or the amount by which its profits were enhanced by the availability of the Program. Nonetheless, the absence of such data is attributable, at least in part, to defendants' non-participation and ultimate default in this litigation, and hence we read any ambiguities in the record in favor of plaintiff.

    Since we have an approximation of the number of patrons in the establishment during the unauthorized display of the Program, we opt for a per-patron base award. There is no formula for calculating the dollar amount per patron. Courts in this district have utilized per-patron amounts ranging widely, from $50.00 to

11

$300.00, in calculating damages. See, e.g., J & J Sports Prods., Inc. v. Schrader Rest. Corp., 485 F. Supp. 2d 422, 423 (S.D.N.Y. 2007) (awarding $50.00 per patron); New Contenders, 1997 WL 538827, at *2 (awarding $300.00 per patron, taking into account profits from sale of food and drink); 45 Midland Enters., 858 F. Supp. at 45 (awarding $50.00 per patron).

Although admittedly arbitrary, we conclude that $300.00 per patron is sufficient to compensate plaintiff for the harm it suffered from defendants' violation of section 605. We utilize this dollar amount after considering the facts that defendants avoided paying a license fee and presumably profited to some extent from their violation by receiving money for meals and/or drinks sold to the patrons attracted by the telecast. As for the number of patrons, we accept the investigator's estimate of twenty-five. (Hand Aff. at Ex. D). Accordingly, base statutory damages should be awarded in the amount of $7,500.00.

In addition, the plaintiff asks for an increased award under section 605(e)(3)(C)(ii), which allows for enhanced damages if "the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. § 605(e)(3)(C)(ii). Although the record does not indicate that the defendants charged an admission fee or openly advertised

the broadcast, the circumstances strongly imply that they acted willfully and for financial gain.

"Willfulness has been defined by the Supreme Court as 'disregard for the governing statute and an indifference for its requirements.'" Cablevision Sys. N.Y. City Corp. v. Lokshin, 980 F. Supp. 107, 114 (E.D.N.Y. 1997)(quoting Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 126-127 (1985)). Factors that court have used to determine whether enhanced damages should be awarded include "i) repeated violations over an extended period of time; ii) substantial unlawful monetary gains; iii) advertising of the broadcast; or iv) charging of a cover charge or premiums for food and drinks." Kingvision Pay-Per-View, Ltd. v. Lalaleo, 429 F. Supp. 2d 506, 515 (E.D.N.Y 2006) (citing Kingvision Pay-Per View v. El Rey Del Bistec y Caridad, Inc., 2001 WL 158667 (S.D.N.Y. Dec. 12, 2001)).

We view willfulness as plainly evident in this case. The acquisition of an encrypted signal by defendants undoubtedly required some affirmative actions that imply both a degree of technical sophistication and a desire to obtain a benefit to which defendants were not entitled. (See Compl. ¶ 19; Joe Hand Aff. at ¶ 14). Of necessity, their actions were willful. See, e.g., Time Warner Cable of N.Y. City v. Googies Luncheonette,

13

Inc., 77 F. Supp. 2d 485, 490 (S.D.N.Y. 1999) ("Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems"); Al-Waha Enters., 219 F. Supp. 2d at 776 ("Based on the limited methods of intercepting closed circuit broadcasting of pay-per-view events and the low probability that a commercial establishment could intercept such a broadcast merely by chance...the courts have held [unauthorized display of a pay-per-view event] willful").

Moreover, plaintiff proffers evidence suggesting that the defendants' violation on this occasion was part of a pattern of behavior by them of pirating cable programs to display for patrons. (See Lonstein Aff. ¶¶ 5 & 6, & Exs. B & C). This conduct also reflects an intent by defendants to profit by their violation. The evident purpose of their efforts was to lure customers or hold them for a longer period of time, presumably to enhance defendants' profits. Necessarily, then, plaintiff satisfies the standard for enhanced statutory damages. See, e.g., Taco Rapido Rest., 988 F. Supp. at 111-112.

As for the amount of the enhancement, although plaintiff encourages the court to award it up to the statutory maximum of $100,000.00, we consider such an amount to be unnecessarily large

14

in view of the absence of any indication that plaintiff has previously sought enforcement against these defendants, the lack of evidence that this establishment was a sizeable or up-scale venue earning significant amounts of money from this practice, and the small number of patrons found by the investigator. Nonetheless, we take seriously the need for general as well as specific deterrence, and note, as well, the affidavit of Mr. Hand, indicating -- even if in general and conclusory terms -- that his company has lost substantial revenues from the piracy practices illustrated in this case. (Hand Aff. ¶ 4). Balancing these considerations, we recommend that the damage award be increased by doubling the base award, thus yielding a statutory damage award of $15,000.00. In our opinion, this amount is sufficient to compensate the plaintiff for any injury caused by the misconduct, and also to deter the defendants and others from future violations.[3]

The complaint names both the establishment and its proprietor as defendants. Since this was a single violation of the statute, defendants should be held jointly and severally liable for a single award of $15,000.00 in statutory damages. See, e.g., Cmtv. Television Sys., Inc. v. Caruso, 284 F.3d 430, 436 (2d Cir. 2002).

---

[3] Deterrence is a pertinent consideration. See Al-Waha Enters., 219 F. Supp. 2d at 776.

II. Attorney's Fees and Costs

Plaintiff is entitled to recover costs and reasonable attorney fees. See 47 U.S.C. § 605(e)(3)(B)(iii) (2000). The determination of reasonable attorney fees begins with calculation of the so-called "lodestar" amount. See, e.g., Joe Hand Promotions, Inc. v. El Norteno Rest. Corp., 2007 WL 2891016, at *5 (E.D.N.Y. Sept. 28, 2007); Kingvision Pay-Per-View Ltd. v. Cazares, 2006 WL 2086031, at *5 (E.D.N.Y. July 25, 2006); see generally Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999).[4]

The presumptively reasonable fee is calculated by setting a reasonable hourly rate that reflects what rate a paying client would be willing to pay, and multiplying that rate by the number of hours reasonably expended litigating the case. Id. at 117; see Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 249 (2d Cir.

_____

[4]One panel of the Second Circuit Court of Appeals opined recently in Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany that "[w]hat the district courts in this circuit produce is in effect not a lodestar as originally conceived, but rather a 'presumptively reasonable fee.'" 493 F.3d 110, 117 (2d Cir. 2007). In accordance with Arbor Hill, we adopt the term "presumptively reasonable fee" in place of "lodestar." Id. at 117-118 ("The meaning of the term 'lodestar' has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness. This opinion abandons its use.").

2007); Cazares, 2006 WL 2086031 at *5. In the absence of unusual circumstances and particularly difficult or novel legal questions, the court should set the reasonable hourly rate at the prevailing rate for similar legal services provided by lawyers of "reasonably comparable skill, experience and reputation[,]" in the relevant community.[5] See, e.g., Farbotko v. Clinton County, 433 F.3d 204, 208 (2d Cir. 2005) (citing Blum v. Stenson, 465 U.S. at 886, 896 & n.11 (1984)). There is a rebuttable presumption that "a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally." Arbor Hill, 493 F.3d at 119. Thus, since that presumption is unrebutted here, we conclude that the relevant community is the Southern District of New York. See, e.g., Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 493 F.3d 110, 118-121 (2d Cir. 2007). When more than one attorney and/or other staff members such as paralegals renders legal services for the same case, the court can use a single blended hourly rate or separate rates for the contributions of each of the legal practitioners their staff

---

[5]Arbor Hill suggests that when determining what a paying client would be willing to pay, the court should bear in mind the twelve Johnson factors. 493 F.3d 110, 114, 117-18 (citing Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), abrogated on other grounds by Blanchard v. Bergeron, 489 U.S. 87, 92-93, 96 (1989)). Without analyzing each factor in detail, we note that this case does not present a difficult question of law, nor does it require any special skill on the part of plaintiff's counsel. See id. at 118-19.

17

members. See In re Cabletron Sys., Inc. Securities Litig., 239 F.R.D. 30, 37 (D.N.H. Oct. 13, 2006).

Plaintiff's attorney reports that she expended a total of three hours and fifteen minutes handling this action, and that she charges $200.00 per hour. She also reports that her paralegal assistant spent a total of two hours and forty-five minutes at a rate of $75.00 per hour (See Lonstein Aff. ¶ 3). The resulting fee request of $856.26 is comparable to awards of attorney's fees in similar cases and is plainly reasonable. See Schrader Rest. Corp., 485 F. Supp. 2d at 424 (awarding $724.00 in attorney's fees based on $200 hourly rate for attorney and $75.00 hourly rate for paralegal); Entm't by J & J, Inc. v. Nina's Rest. & Catering, 2002 WL 1000286, at *4 (S.D.N.Y. May 9, 2002) (awarding $1,575.00 in attorney's fees in similar case); Ramsarran, 2002 WL 720480, at *3 (awarding $850.00 in attorney's fees based on $250.00 hourly rate).

Plaintiff also seeks to recover $450.00 in costs incurred, which include fees for service of process and filing. (Lonstein Aff. ¶ 3). We recommend that this amount be awarded.

## CONCLUSION

For the foregoing reasons, we recommend entry of a judgment against the defendants, jointly and severally, in the amount of $15,000.00 in statutory damages under section 605 of the Communications Act, $856.25 in attorney fees and $450.00 in costs, for a total award of $16,306.25.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable George B. Daniels, Room 630, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Serv., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED:  New York, New York
        February 11, 2008


                              RESPECTFULLY SUBMITTED,


                              _____

                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been mailed this date to:

Nicholas Cartagena, Esq.
Lonstein Law Office, P.C.
1 Terrace Hill
P.O. Box 351
Ellenville, NY 12428

Ricardo Martinez
1203 Findlay Avenue
Apt. 33A
Bronx, NY 10456-4143

Lucky 7
658 Dawson Street
Bronx, NY 10455-2413